United States District Court
Southern District of Texas
**ENTERED**
February 15, 2023
Nathan Ochsner, Clerk

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| JAMES GUNTER, | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:19-CV-2789 |
| | § | |
| ZEAMARINE CARRIER GMBH, ET AL., | § | |
| *Defendants*. | § | |

### MEMORANDUM AND RECOMMENDATION

This maritime personal injury case is before the Court on Defendant ZeaMarine Carrier GMBH's Motion for Summary Judgment.[1] ECF 54. Having considered the parties' arguments at a hearing on the record on February 6, 2023, the parties' submissions, and the law the Court recommends that ZeaMarine's Motion for Summary Judgment be DENIED.

### I.     Background

The following facts are undisputed unless otherwise noted. Plaintiff James Gunter was injured on May 3, 2019 when he was involved in an accident while working as a stevedore at the Port of Point Comfort, Texas. ECF 14 ¶ 7. According to Plaintiff's Second Amended Complaint, "a crane operator improperly moved the crane from a ZEA Bremen cargo vessel while Plaintiff was changing out rigging, causing Plaintiff to fall." *Id.* At the time of the incident, Gunter was employed by Gulf Stream Marine (GSM). *Id.* The M/V Zea Bremen (Vessel) was owned and operated by Donald Shipping, Inc. (Donald Shipping). *Id.* Defendant ZeaMarine Carrier GMBH (ZeaMarine) contends that at the time of incident it was the time charterer of the Vessel, a fact that Gunter disputes.

---

[1] The District Judge referred this case to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the Cost and Delay Reduction Plan under the Civil Justice Reform Act, and Federal Rule of Civil Procedure 72. ECF 26.

On the day of the incident, the Vessel crew and stevedores performed a morning lift at approximately 8:15 a.m. to unload cargo from the Vessel.  ECF 77-1 at 20 (76:14-23).  The incident in which Gunter was injured occurred at approximately 2:45 p.m.  ECF 77-1 at 20 (77:4-10).  The work that was being done at the time of the incident lift involved "rigging" the crane or changing out grommets on the crane in order to prepare for a heavy lift to unload additional cargo from the Vessel that afternoon.  ECF 77-1 at 20 (77:4-78:12), 21(78:4-12).  The crane was located on the Vessel and was operated by Dandy Cuyos, a member of the Vessel crew.  ECF 76-1 at 6 (19:15-19), 21(78:13-14).  At the time of the incident, Gunter was standing on the chassis or flat section of a semi-trailer that had been used to transport equipment to be used later that day in a heavy cargo lift.  *See, e.g.*, ECF 54-1 at 145 (14:3-23).  The crane and crane operator were on the Vessel. ECF 76-1 at 5-6 (describing a "shoreside lift").  While Gunter was still on the chassis, the crane operator began to lift the rigging, causing the cables attached to the rigging to move.  ECF 54-1 at 145 (14:3-23).  Although the parties dispute exactly how or why Gunter became entangled in the cable, there is no dispute that he fell and was injured.  Also present at the time of the incident (in addition to the crane operator, Gunter, and other stevedores), were Sergei Poveleiko (Vessel First Mate employed by Donald Shipping), Adam Trevino (Chief Stevedore or Foreman employed by GSM), and Michael Rogge (Port Captain or "Super Cargo" employed by ZeaMarine).

Gunter initiated this case against ZeaMarine in state court in Harris County, Texas on June 10, 2019.  ZeaMarine removed the case to this federal court based on diversity jurisdiction, after which Plaintiff filed an Amended Complaint adding Donald Shipping as a Defendant and asserting claims against both ZeaMarine and Donald Shipping for negligence.  ECF 1; ECF 14.  After some discovery, ZeaMarine filed its Motion for Summary Judgment, which has been fully briefed and is ripe for determination.  *See* ECF 54, 57-60.

2

## II.      Summary Judgment Standards

Summary judgment is appropriate if no genuine issues of material fact exist, and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  The party moving for summary judgment has the initial burden to prove there are no genuine issues of material fact for trial.  *Provident Life & Accident Ins. Co. v. Goel*, 274 F.3d 984, 991 (5th Cir. 2001).  Dispute about a material fact is "genuine" if the evidence could lead a reasonable jury to find for the non-moving party.  *Hyatt v. Thomas*, 843 F.3d 172, 177 (5th Cir. 2016).  "An issue is material if its resolution could affect the outcome of the action."  *Terrebonne Parish Sch. Bd. v. Columbia Gulf Transmission Co.*, 290 F.3d 303, 310 (5th Cir. 2002).  If the moving party meets its initial burden, the nonmoving party must go beyond the pleadings and must present evidence such as affidavits, depositions, answers to interrogatories, and admissions on file to show "specific facts showing that there is a genuine issue for trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

The court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor.  *R.L. Inv. Prop., LLC v. Hamm*, 715 F.3d 145, 149 (5th Cir. 2013).  In ruling on a motion for summary judgment the Court does not "weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence."  *Honore v. Douglas,* 833 F.2d 565, 567 (5th Cir. 1987).  However, "[c]onclus[ory] allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic argumentation do not adequately substitute for specific facts showing a genuine issue for trial."  *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 337 (5th Cir. 2008) (citation omitted).

## III.     Negligence Standards

Section 905(b) of the Longshoremen's and Harbor Workers' Compensation Act (LHWCA) codifies a cause of action that an injured stevedore or longshoreman can bring against a vessel.  *Scindia Steam Nav. Co. v. De Los Santos*, 451 U.S. 156, 166–67 (1981).  A vessel may be liable

"if it actively involves itself in the cargo operations" and negligently causes an injury. *Id.* The Fifth Circuit has held that a time charterer of a vessel is included within the definition of "vessel" under the LHWCA but has limited the liability of time charterers under the LHWCA to injuries caused by negligence in conducting time charterer duties. *See Kerr-McGee Corp. v. Ma-Ju Marine Servs., Inc.*, 830 F.2d 1332, 1338-39 (5th Cir. 1987) (time charterer was subject to liability under section 5(b) only for negligence in its time-charterer capacity); *Matter of P & E Boat Rentals, Inc.*, 872 F.2d 642, 647 (5th Cir. 1989) (stating that the general rule that a time-charterer with no control over the vessel has no liability for negligence of the vessel's crew "does not exempt a time charterer from liability if it is negligent in conducting its activities as time charterer."). Traditional time charterer duties include determining shipping routes and destinations and designating the cargo the vessel will carry. *Kerr-McGee Corp.*, 830 F.2d at 1340-41. The owner of the vessel, however, continues to navigate and manage the vessel and maintains possession and control of the vessel unless the time charter agreement expressly says otherwise. *Id.*

The Fifth Circuit recently restated the general rule that a time charterer who has no control over the vessel assumes no liability for the negligence of the vessel's crew "absent a showing that the parties to the charter intended otherwise." *Grand Famous Shipping Ltd. v. China Navigation Co. Pte., Ltd.*, 45 F.4th 799, 805 (5th Cir. 2022) (quoting *In re P & E Boat Rentals, Inc.*, 872 F.2d 642, 647 (5th Cir. 1989)). However, even in the absence of the parties' intent, there are at least two ways a time charterer may be held liable for a vessel's negligence. First, the Fifth Circuit recognized in *Grand Famous Shipping* that a time charterer may be held liable as the vessel's *de facto* owner if it exercises operational control over the vessel. *Id.* at 804. Second, the Fifth Circuit made clear in *Graham v. Milky Way Barge, Inc.*, 824 F.2d 376, 388 (5th Cir. 1987) that a time charterer is liable for its own "independent negligence" that causes a plaintiff's injury.

## IV.    Analysis

ZeaMarine argues that Gunter's negligence claim against it must be dismissed because as the time charterer of the vessel ZeaMarine:  (1) did not have operational control of the Vessel, and (2) there is no evidence that ZeaMarine committed an act of "independent negligence."  ECF 54. Gunter, on the other hand, argues the record demonstrates fact issues as to: (1) whether ZeaMarine was the *de facto* owner of the vessel; and (2) whether ZeaMarine committed an independent act of negligence that caused Gunter's injury.  ECF 58.  Donald Shipping joins Plaintiff in opposing ZeaMarine's Motion for Summary Judgment, arguing both that the record creates a fact issue as to ZeaMarine's operational control of the vessel and its independent negligence.[2]  *See* ECF 57 at 5.

> ### A.  Plaintiff has not met his summary judgment burden to create a genuine issue of fact as to whether ZeaMarine actually controlled the Vesssel and can be held liable as a *de facto* owner of the vessel.

In October 2018, ZeaMarine and Donald Shipping became parties to the February 14, 2018 Time Charter form agreement originally executed by Donald Shipping and RZ Carrier GmbH & Co.   ECF 54 at 7 (citing Charter Party Extension, Zeamarine 0000036).  The October 2018 extension named ZeaMarine as the charterer for the remainder of the charter period.  *Id.*  The Time Charter form agreement sets forth the respective responsibilities of the vessel "Owner," Donald Shipping, and the "Charterer," ZeaMarine.  ECF 54-1 at 1-35.  Importantly, the Time Charter expressly provides that:

> Nothing herein stated is to be construed as a demise of the vessel to the Time
> Charterers.  The Owners to remain responsible for the navigation of the vessel, acts

---

[2] ZeaMarine objects to Donald Shipping's standing to oppose ZeaMarine's Motion for Summary Judgment on Gunter's claims against ZeaMarine.  ECF 60.  ZeaMarine has provided no controlling authority precluding consideration of Donald Shipping's Response and Donald Shipping has cited cases from district courts within the Fifth Circuit that considered responses filed by a co-defendant.  *See* ECF 57 at 13-14.  In any event, the Court declines to decide the issue because the issues have been adequately briefed and argued by Gunter.

> of pilots, tugboats, etc., insurance, crew, and all other matters, same as when trading
> for their own account.

*Id.* ¶ 26.  The Time Charter expressly allocates to Owner the responsibility for injuries to

third parties:

> Owners to remain responsible for and to indemnify Charterers for any personal
> accidents and /or any injuries sustained by persons employed by the Owners or any
> persons on board or near the vessel [provided it is not due to their own or other third
> parties negligent actions] . . ..

*Id.* ¶ 30.  No party contends that the Time Charter form agreement demonstrates an intent by the

parties that the Time Charterer bears the responsibility for Vessel negligence.  Plaintiff, however,

argues that ZeaMarine had actual control of the Vessel and therefore is a de facto owner of the

vessel, and like Donald Shipping, is responsible for Vessel negligence.

Plaintiff has not met his burden to present sufficient summary judgment evidence from

which a reasonable jury could find ZeaMarine liable as the de facto Vessel owner.  Gunter's

contention that ZeaMarine was the de facto owner of the Vessel is based entirely on the testimony

by the Vessel's crane operator and Chief Mate that ZeaMarine's supercargo "supervised" the work

of the stevedores on the day of the incident.  *See* ECF 58, 76.  Even assuming that fact to be true,

supervision of the stevedores on the day of the incident fails to demonstrate the operational control

of the Vessel required to treat the time charterer as a de facto owner.  Courts in this circuit have

found operational control lacking in situations in which the time charterer did much more than

supervise stevedores.  For example, in *Grand Famous Shipping, Ltd.*, the district court found and

the Fifth Circuit affirmed that the following were not sufficient to demonstrate operational control

over a vessel:  (1)  renaming and painting of its own logo on the vessel; (2) equipping the vessel

with the charterer's software to monitor the vessel's movement and receive reports from the crew;

(3) listing itself as the vessel "manager"  on the Lloyd's Register of Ship Owners & Managers; (4)

identifying the vessel as one the charterer operated; and (5) the fact that the charterer managed and maintained its own Safety Management System on other vessels in its fleet.  *Grand Famous Shipping Ltd. v. Port of Houston Auth*., 574 F. Supp. 3d 438, 444 (S.D. Tex. 2021); *Grand Famous Shipping, Ltd.*, 45 F.4th at 803-4; *see also*, *Barron v. BP Am. Prod. Co.*, 590 F. App'x 294, 296 n.2 (5th Cir. 2014) (finding evidence that time charterer "directed" the oil spill response and containment efforts in which the vessel was engaged when the injury occurred; required vessel owners to maintain radio contact; required particular training of the crew; and directed the fleet back to port on the day of the injury were insufficient to raise a factual dispute that the time charter was the vessel's owner pro hac vice).  In sum, Plaintiff's evidence that Rogge and therefore ZeaMarine controlled the work of the stevedores fails to raise a genuine issue of fact as to whether ZeaMarine controlled the vessel and therefore can be held liable for the vessel crew's allegedly negligent conduct as a de facto owner.

> ### B. Plaintiff has met his summary judgment burden to demonstrate a genuine issue of material fact as to ZeaMarine's independent negligence.

ZeaMarine's counsel acknowledged at the summary judgment hearing on February 6, 2023, that regardless of the parties' agreements set forth in the charter agreement, a time charterer may be held liable for its own negligent conduct.  In *Graham v. Milky Way Barge, Inc.*, the Fifth Circuit recognized "a distinction between a time charterer's potential liability under the time charter and independent tort liability which is not governed by the time charter."  824 F.2d at 388. The district court in that case held that the negligence of the time charterer who dispatched the vessel to work in unprotected waters and failed to relay critical weather information, contributed to the capsizing of the vessel.  *Id.* at 387-88.  The Fifth Circuit noted the charter agreement limited the time scope of the time charterer's liability but concluded that "[a]lthough it may be unusual for a time charterer to be held liable for an incident concerning the vessel under charter," the district

court did not err in finding that the time charterer's "independent negligence" contributed to the capsizing of the vessel. *Id.* at 388.

Here, Gunter has produced something more than a scintilla of evidence that ZeaMarine's independent negligence contributed to Gunter's injury. The evidence of ZeaMarine's potentially negligent conduct is thin, particularly since it is undisputed that Gunter's injury did not occur during the hooking up or moving of cargo. Nonetheless, the Court concludes that the evidence, summarized below, is sufficient to meet Gunter's summary judgment burden and therefore requires denial of summary judgment.

The summary judgment evidence demonstrates that Mike Rogge, a ZeaMarine employee, was the Supercargo (also called the Port Captain) at the Port of Point Comfort at the time of the May 3, 2019 incident. ECF 54-1 at 97-98. The main job of the Supercargo/Port Captain during heavy lifting operations is inspecting the lifting arrangements prior to the lift and managing the sequence of pieces to be loaded, i.e., making sure "they hooked up the correct piece and they hooked it up correctly. . . . And then mainly [overseeing] stability issues from that point." *Id.* at 98. Rogge confirmed that ZeaMarine arranged for Gulf Stream Marine to perform stevedoring operations on the day of the incident. *Id.* at 101-02. Rogge does not remember much about the specific incident at issue, including where he was standing when it happened or whether he was assisting with signaling during lift operations, but he testified that he was not an eyewitness to the accident. *Id.* at 101, 104-05, 112.

Gunter relies primarily on the contemporaneous statement and the deposition testimony of the Vessel's crane operator, Dandy Cuyos, to support his contention that Rogge, a ZeaMarine employee, was directing or supervising the stevedores near the time of the incident. Cuyos, whose first language is not English, gave the following written statement on May 3, 2019:

> While I'm operating crane . . . executing commands with clear communication through vhf ch. 17 and hand signal, stevedore arranging on the heavy lift truck trailer with a heavy lift grummets for make discharge to jetty for next heavy lift cargo both Ch. Mate and supercargo Mike Rogge was ashore and assisting with signal men chief stevedore who make general commend under shift of stevedoring.

ECF 54-1 at 139.  Cuyos, perhaps because English is not his first language, gave seemingly contradictory testimony regarding who was supervising the grommet movement operation during which Plaintiff was injured.  Some of Cuyos's testimony implicates Rogge, a ZeaMarine employee as the supervisor at the time of the incident:

> Q:   All right.  And no – one other thing I want to get is that this man Mike Rogge, . . . he was the super- supercargo who was supervising the whole operation and you know that to be the truth, correct?
> A:   Supercargo.
> Q:   And he was supervising the operation and making sure that it was running safely, correct?
> A:   Yes, it was him.

ECF 76-1 at 16 (60:7-14).  However, Cuyos also testified that although the supercargo "is in charge of the operation" and "in charge of what needs to be lifted next," the chief stevedore (a GSM employee) is in charge of the grommet movements, the operation during which Plaintiff was injured.  ECF 76-1 at 17 (62:21-25), 18 (69:4-9) (testifying the chief stevedore gave the command to lift because he was in charge of rigging the grommets and what happened on the dock).  Cuyos also testified that he took direction only from the Vessel's chief mate who signaled him to make the lift.  ECF 76-1 at 18 (67:20-25).  Cuyos further testified that he did not see or hear any commands from Rogge, he only saw him talking to the Chief Mate but could not hear what they were saying.  *Id.* at 16 (60:1-23).  Although Cuyos' testimony is somewhat contradictory, it is some evidence that Rogge played a supervisory role in the events that occurred on the day of the incident.

The record also contains testimony and a statement from Sergio Poveleiko, the chief mate on the Vessel on the day of the incident.  ECF 54-1 at 39, 47, 53.  Unlike Cuyos, Poveleiko did not mention Rogge or a supercargo in his statement regarding the accident.  ECF 54-1 at 138.  However, Poveleiko testified that the supercargo "was involved," but did not give any orders.  *Id.* at 60.  Poveleiko went on to clarify that the supercargo was primarily involved after the incident, when the cargo was connected to the lifting gear, and that the supercargo "did not participate in the connection of the wires and lifting process of [the] wires."  *Id.* at 60-61.  Furthermore, Poveleiko testified that he gave the command to Cuyos to start lifting only after the stevedore said it was okay "because the stevedoring company was responsible for the connection and rigging of the lifting gear."  *Id.* at 46, 47, 53, 63.  Thus, Poveleiko's testimony, while far from conclusive, at least mentions that Rogge, a ZeaMarine employee, was involved in the incident even though he did not give any orders.

The Master of the Vessel, Oleksandr Melnyk, prepared a "Letter of Protest" that echos Cuyos's statement that "supercargo Mike Rogge was ashore and [gave] assistance with commands to our certified crane operator."  ECF 54-1 at 140.  The summary judgment record does not establish whether Melnyk has any personal knowledge of what happened during the incident.  However, the Letter of Protest assigns responsibility for the operation in which Plaintiff was injured to the stevedoring company.  *Id.* ("The stevedoring person charged for managing and make offload the grommets from trailer to shore for next continuation rigging" and "I hold all responsibilities to Stevedoring Company for Accident Injured Person (ashore) which happen due to stevedore neglects during discharging HL wire from trailer and when they did a work ashore – not on board.").

10

Also in the summary judgment record is the "Ship to Shore Safety Checklist," which was executed by Mike Rogge "For Shore" when the Vessel entered the Port.  ECF 54-1 at 497.  The Checklist confirms that Rogge was ZeaMarine's representative on shore that day, although it does not establish that he was responsible for supervision of the stevedores during the moving of grommets and wires, the activity taking place when Gunter was injured.  *Id.*  Donald Shipping argued at the summary judgment hearing that Rogge's signature on the Ship to Shore Safety Checklist creates a reasonable inference that Rogge was responsible for supervising the shore operations and thus creates a disputed issue of fact as to whether Rogge had a duty to stop an unsafe lift and prevent Plaintiff's injuries.

In sum, after resolving all disputed facts and making all inferences in Plaintiff's favor, the record contains some evidence from which a jury could find that Rogge was involved with or participated in rigging activities during which Plaintiff was injured.  It is for the jury, not this Court, to weigh the evidence and assess the credibility of witnesses and resolve disputed issues of fact.  *Honore v. Douglas,* 833 F.2d 565, 567 (5th Cir. 1987).  This particularly important in this case where certain witnesses speak English as a second language and gave seemingly contradictory or ambiguous written statements and deposition testimony.  Further, while it is undisputed that there was no cargo being attached to or lifted by the crane at the time of the incident, the preparation of the crane occurs temporally between two events for which the supercargo undoubtedly had supervisory responsibility—the cargo lift that occurred that morning, and the heavy lift that was scheduled to occur that afternoon.  Despite ZeaMarine's argument to the contrary, the witness testimony does not draw a clear distinction between those activities.  The Court concludes that Plaintiff has met his summary judgment burden to raise a disputed issue of

fact as to whether ZeaMarine had a duty or committed a negligent act during the incident in which Plaintiff was injured.  Therefore, ZeaMarine's Motion for Summary Judgment should be denied.

**V.      Conclusion and Recommendation**

For the reasons discussed above, the Court RECOMMENDS that ZeaMarine's Motion for Summary Judgment (ECF 54) be DENIED and this case remain set for Docket Call on April 14, 2023.

The Clerk of the Court shall send copies of this Memorandum and Recommendation to the respective parties, who will then have fourteen days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c).  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc), superseded by statute on other grounds.

Signed on February 15, 2023, at Houston, Texas.

Christina A. Bryan
United States Magistrate Judge